IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CLYDE E. MEASE, JR.,        )
                                 )
        Plaintiff,        )
                                 )    C.A. No. 06-271-SLR
     v.                )
                                 )
WILMINGTON TRUST COMPANY   )    Trial By Jury Demanded
                                 )
        Defendant.     )

**DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS**

Sheldon N. Sandler (No. 245)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
ssandler@ycst.com
Attorneys for Defendant

DATED: June 9, 2006

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS............................................................................................................. i

TABLE OF AUTHORITIES .................................................................................................... ii

ARGUMENT ............................................................................................................................ 1

I.      THE COURT SHOULD DISMISS PLAINTIFF'S STATE STATUTORY
        CLAIM SINCE HE HAS ELECTED TO PURSUE HIS FEDERAL
        STATUTORY REMEDY........................................................................................... 1

II.     THE COURT SHOULD NOT ACCEPT SUPPLEMENTAL JURISDICTION
        OVER PLAINTIFF'S COMMON LAW CLAIMS. ....................................................6

CONCLUSION......................................................................................................................... 9

# TABLE OF AUTHORITIES

**Page**

**Cases**

*DeRasmo v. Hospitality Franchise Systems, Inc.,*
   1995 U.S. Dist. LEXIS 6349 (D. N.J. May 8, 1995) ........................................................... 7

Gagliardo v. Connaught Laboratories, Inc.,
   311 F.3d 565 (3d Cir. 2002) ..................................................................................... 4

*Gayle v. County Of Marin*,
   2005 U.S. Dist. LEXIS 40514,
   (N.D. Cal. Dec. 6 2005) .......................................................................................... 6

*Kelly v. American Standard, Inc.,*
   640 F.2d 974 (9th Cir. 1981) ................................................................................... 4

*Lyon v. Whisman & Associates, P.A.,*
   45 F.3d 758 (3d Cir. 1995) ...................................................................................... 7

*Potence v. Hazleton Area Sch. Dist.,*
   357 F.3d 366 (3d Cir. 2004) .................................................................................... 3

Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc.,
   399 F.3d 52 (1st Cir. 2005)...................................................................................... 5

*Starceski v. Westinghouse Elec. Corp.,*
   54 F.3d 1089 (3d Cir. 1995) .................................................................................... 4

*Trans World Airlines, Inc. v. Thurston,*
   469 U.S. 111, 83 L. Ed. 2d 523, 105 S. Ct. 613 (1985)....................................................... 3

**Other Authorities**

19 *Del. C.* § 715(b) ................................................................................................ 3

19 *Del. C.* §710(2), .............................................................................................. 1

DB01:2114947.1 044203.1023

19 *Del. C.* §714(b), ............................................................................................................... 2

28 U.S.C. §1367(c)(1)............................................................................................................... 3

42 U.S.C. § 12201(b) ............................................................................................................... 4

iii

## ARGUMENT

I.   **THE COURT SHOULD DISMISS PLAINTIFF'S STATE STATUTORY CLAIM SINCE HE HAS ELECTED TO PURSUE HIS FEDERAL STATUTORY REMEDY.**

Plaintiff may not pursue his claim under the Delaware Discrimination in Employment Act, 19 *Del. C.* §§ 710-718 ("the DDEA") in this Court. He has ignored the language in the General Assembly's synopsis of Senate Bill 154 stating that the bill was intended to permit "civil actions in Superior Court." Delaware Bill Summary, 2004 Reg. Sess. S.B. 154 (Exhibit A attached). The synopsis is consistent with the several provisions in the DDEA which also mandate that DDEA lawsuits shall be pursued exclusively in Superior Court.

Until the Delaware discrimination statute was amended in 2004, there was no state cause of action for discrimination, only an administrative process. When the Delaware General Assembly did amend the statute, it was careful to specify how the Delaware claim could be asserted. Both in the synopsis, which states that "[t]his bill . . . creates a corresponding Delaware Right to Sue **in Superior Court** after exhausting Administrative remedies," (emphasis added) and repeatedly in the law itself, the General Assembly makes clear its intention to create an "either/or" situation; either the claimant can pursue his or her state law remedy in Superior Court or his or her federal law remedy in District Court.

In the definitions section of the DDEA, 19 *Del. C.* §710(2), the "Charging Party" is identified as a person who "preserves a cause of action in Superior Court" by exhausting administrative remedies. And even more significantly, the "Delaware Right to Sue Notice," the receipt of which is a prerequisite to filing a state discrimination lawsuit, gives the charging party a "right to commence a lawsuit in Superior Court." 19 *Del. C.*

1

§710(4). The statute could have said, but does not say, that the claim may be filed in "any court of competent jurisdiction."

Based on that language alone, Plaintiff's state statutory claim should be dismissed, since his Delaware Right to Sue Notice does not authorize him to commence a lawsuit in federal court, so that a necessary prerequisite to suit has not been satisfied. The General Assembly made the same point again in 19 *Del. C.* §714(b), which specifies that "[t]the Delaware Right to Sue Notice shall include authorization for the charging party to bring a civil action under this chapter in Superior Court by instituting suit within 90 days of its receipt or within 90 days of receipt of a Federal Right to Sue Notice, whichever is later."

Thus, even though a plaintiff is afforded the luxury of waiting until the federal administrative process is also exhausted, and then deciding which statutory claim to elect to pursue, if he or she elects to sue under the state law, that suit has to be filed in Superior Court. The statute does not authorize a state DDEA lawsuit to be filed or pursued in federal court.

Additionally, the General Assembly goes on to require an "**election of remedies**," stating that "[t]he charging party is barred by this **election of remedies** from filing cases in both Superior Court and the federal forum. If the charging party files in Superior Court and in a federal forum, the respondent may file an application to dismiss the Superior Court action under this **election of remedies** provision." *Id.*, §714(c). Emphasis added.

Again in 19 *Del. C.* §715 the General Assembly makes the point that "Superior Court shall have jurisdiction over all proceedings brought by the charging party

2

pursuant to § 714 of this title." The statute gives only the Superior Court, rather than any court of competent jurisdiction, the authority to provide relief. 19 *Del. C.* §715(1).

Read as a whole, the statute requires plaintiffs to choose between pursuit of a claim under the DDEA in state court or pursuit of a claim under federal law in federal court. If the General Assembly had intended to allow DDEA claims to be pursued in federal court simultaneously with similar claims under federal law, it would have so stated, but it did not.

This Court may decline to exercise supplemental jurisdiction where the claim raises "a novel . . . issue of state law." 28 *U.S.C.* §1367(c)(1). Defendant submits that this is such a case. The General Assembly has structured the Delaware statute so that a prerequisite to filing suit is a right to sue notice, the language of which only authorizes suit to be filed in Superior Court, and has made it plain that a litigant must elect his remedies and choose either a DDEA suit in Superior Court or a federal claim in this Court. While Defendant submits that this plain language requires the dismissal of a state law claim filed elsewhere than in Delaware Superior Court, at the very least it raises a novel issue that has not yet been addressed by the Delaware courts, i.e., whether the Delaware General Assembly intended that suits under the Delaware discrimination statute can be pursued in federal court along with federal discrimination lawsuits. Therefore, this Court should decline supplemental jurisdiction.

Moreover, by attempting to pursue both his federal and his Delaware claims, Plaintiff is seeking overlapping, duplicative remedies. The DDEA allows the recovery of punitive damages. 19 *Del. C.* §715 (1)(c). Liquidated damages under the ADEA are also punitive in nature. *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 373 (3d Cir. 2004) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985); *Starceski v.*

3

*Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 (3d Cir. 1995)); *Kelly v. Am. Standard, Inc.*, 640 F.2d 974 (9th Cir. 1981) (noting that liquidated damages are a form of punitive damages, intended to have a deterrent effect).

Permitting recovery of both punitive damages under the DDEA and liquidated damages under the ADEA would result in a windfall to the Plaintiff and would contravene the DDEA's intent to cap compensatory and punitive damages. If Plaintiff's position were accepted, and he were able to prove that he had lost wages in the amount of, for example, $300,000 as a result of willful age discrimination by the Defendant in violation of the ADEA, Plaintiff would be entitled to recover liquidated damages, punitive in nature, in the amount of an additional $300,000. The jury would also, according to Plaintiff's claim, be authorized to award him punitive damages in an amount up to $300,000 under the DDEA for age discrimination. Plaintiff could conceivably, then, recover $600,000 in punitive damages, in contravention of the DDEA's intent to cap damages meant to punish the Defendant rather than to compensate the Plaintiff. Rejection of Plaintiff's argument would fulfill the intent of both the state and federal legislatures to prevent windfalls to discrimination plaintiffs.

*Gagliardo v. Connaught Laboratories, Inc.*, 311 F.3d 565 (3d Cir. 2002), cited by Plaintiff, is not on point. There, the federal statute in question was the Americans with Disabilities Act, not the ADEA. The scenario described above could not occur because the damages schemes under the state and federal law in *Gagliardo* were compatible, not conflicting, as is the case here. Moreover, the Americans with Disabilities Act includes a provision that eschews any intent to preclude more generous awards based on state or local law. 42 U.S.C. §12201(b) ("Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State . . . that provides

4

greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter."). The ADEA contains no such provision. *Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc.*, 399 F.3d 52 (1st Cir. 2005), also cited by Plaintiff, is unpersuasive for the same reason.

Thus, in addition to flying in the face of the clear language of the statute, the Plaintiff's effort to circumvent the expressed desire of the General Assembly and sue on both the state and federal statutes at the same time seeks to gain a windfall duplicative recovery for him. Such a result would be unfair and should not be permitted. The claim based on the Delaware discrimination statute should be dismissed.

044203.1023

## II.    THE COURT SHOULD NOT ACCEPT SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S COMMON LAW CLAIMS.

Plaintiff makes contradictory assertions in his Answering Brief, claiming both that the federal statutory and state common law claims are "**very similar**, and arise out of the same facts," Answering Brief 21, and that his state common law implied covenant claim "stands in its own right as **a separate and distinct claim** that is not premised upon age discrimination." *Id.,* at 22. (emphasis added). In his brief, the Plaintiff has elaborated on the allegations made in his Complaint, and it is now even plainer than before that the facts relating to his state law claims are quite distinct from those concerning his age discrimination claim, which seems to be based exclusively on the fact that "["a]fter the plaintiff's termination his work had to be distributed to co-workers who were substantially younger than the plaintiff." Answering Brief 7; Complaint ¶¶12, 15.

Contrary to Plaintiff's assertions, at the unemployment compensation hearing, Defendant's witnesses testified clearly about the reason why Plaintiff was terminated.[*] Plaintiff was a Private Client Advisor who had been employed for over twenty years and was earning over $112,000 a year. It was discovered that he had made an investment for a bank client, and when the client complained, he took funds from the account of a second client and reimbursed the first client, and transferred the investment to the unwitting second client, all without informing either client or the bank. Exh. B, pages 3-4. This was highly unethical behavior that contravened bank policy. The reason Plaintiff was awarded unemployment compensation was because the Defendant's witnesses, who were nonlawyers and

---

[*] Attached as Exhibit B is a transcript of the unemployment compensation hearing, which was transcribed from a tape of the hearing supplied by the Delaware Dept. of Labor. Defendant requests that the Court take judicial notice of that hearing. *Gayle v. County Of Marin*, 2005 U.S. Dist. LEXIS 40514, at *3 n.2 (N.D. Cal. Dec. 6 2005).

044203.1023

unrepresented at the hearing, declined to reveal the names of the bank customers whose accounts were involved.  Exh. B, page 4.

Plaintiff's brief attempts to downplay the significance of the Third Circuit's opinion in *Lyon v. Whisman & Associates, P.A.*, 45 F.3d 758 (3d Cir. 1995) and the other related cases cited in Defendant's opening brief that completely undercut Plaintiff's claim of supplemental jurisdiction.  Plaintiff's assertion that *DeRasmo v. Hospitality Franchise Systems, Inc.*, 1995 U.S. Dist. LEXIS 6349 (D. N.J. May 8, 1995), is inapposite because "the defendant has not sought dismissal of the Federal claims," Answering Brief 16, is completely off the mark.

In addressing supplemental jurisdiction in that case which, like this one, involved an ADEA claim, a state statutory age discrimination claim, and common law implied covenant and breach of contract claims, the court said that it is "apparent that the Third Circuit interprets section 1367 and *Gibbs* very narrowly."  *Id.,* at *26.  The court goes on to exercise supplemental jurisdiction over the state statutory claim but then points out that "the nexus between plaintiff's remaining state law claims is far more remote."

> The Court finds only one fact is common to both plaintiff's ADEA claims and the remaining state law claims: the employer/employee relationship.  This fact must be proven under both the ADEA claims and the state law claims for breach of employment contract, breach of the implied covenant of good faith and fair dealing, and breach of relocation contract. . . . With respect to his ADEA claim plaintiff must prove he was in a protected class, that he was qualified for the position and that he was discharged because of his age.  Each of these facts is irrelevant, or at least immaterial, to plaintiff's state law breach of contract and tort claims.
>
> Conversely, with respect to his state law claims, plaintiff must prove the terms of his employment and termination contract; he must prove that certain oral promises were made, he must prove that these oral promises created a binding oral contract or that he relied to his detriment on these promises; he must prove

7

> that [the employer] failed to deal "fairly" with him; . . . None
> of these facts are material to plaintiff's ADEA claim. Thus,
> plaintiff's state and federal claims present entirely different
> elements of proof and theories of recovery. . . . Therefore, the
> Court does not have the power to exercise supplemental
> jurisdiction over plaintiff's state law claims.

*Id.*, at *27-*28.

Plaintiff's implied covenant claim in this case alleges that Defendant engaged in fraudulent misrepresentations by manipulating its records to accomplish his dismissal, Answering Brief 23, and took actions that were aimed at denying Plaintiff "the fruits of his employment contract." *Id.*, at 24. His proof in this case would be virtually identical to what the *DeRasmo* court outlined.

Plaintiff is apparently also making a breach of contract claim. Since Plaintiff was an employee at will, the "facts" relating to how he came to have any contract at all will be entirely independent of his ADEA claim, *id.*, at 23, n.5, as will the "facts" relating to the supposed falsification of his records.

The cases from outside the Third Circuit that Plaintiff relies on are inapposite. As the court in *DeRasmo* observed, some courts have held that a "loose nexus" is enough for supplemental jurisdiction but "the Third Circuit has expressly rejected this loose nexus test." Under the law of the Third Circuit, this court should decline supplemental jurisdiction and dismiss Plaintiff's state common law claims.

**CONCLUSION**

Defendant's motion to dismiss Plaintiff's Delaware statutory and common law

claims should be granted.

Respectfully submitted,


YOUNG CONAWAY STARGATT & TAYLOR, LLP


Sheldon N. Sandler (No. 245)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
ssandler@ycst.com
Attorneys for Defendant

DATED: June 9, 2006

## CERTIFICATE OF SERVICE

I, **Sheldon N. Sandler**, **Esquire**, hereby certify that on **Friday, June 9, 2006**, I

electronically filed a true and correct copy of the foregoing **Defendant's Reply Brief in**

**Support Of Its Motion to Dismiss,** which will send notification that such filing is available for

viewing and downloading to the following counsel of record.  A courtesy copy of such

**Defendant's Reply Brief in Support Of Its Motion to Dismiss** was also hand delivered to the

following counsel of record on this date.

>Gary W. Aber, Esquire
>Aber, Goldlust, Baker & Over
>702 King Street, Suite 600
>P.O. Box 1675
>Wilmington, DE 19899-1675

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Sheldon N. Sandler, Esquire (No. 0245)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
Email:  ssandler@ycst.com
Attorneys for Defendant

DATED:    June 9, 2006

**❶Back**                            *Senate Bill # 154*

**Primary Sponsor:**  Marshall          **Additional Sponsor:**  Lofink

**Introduced on :**  06/12/2003

**Long Title:**  AN ACT TO AMEND TITLE 19 OF THE DELAWARE CODE RELATING TO
DISCRIMINATION IN EMPLOYMENT.

**Synopsis:**  This bill eliminates the Equal Employment Review Board, and creates a corresponding Delaware Right
to Sue in Superior Court after exhausting Administrative remedies. This bill confirms that Chapter 7 is
the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all
such claims with the Department of Labor for review and action. This bill effectively re-establishes the
exclusive remedy put in question by the decision in Schuster v. Derocili, 775 A. 2d 1029 (2001).
Some definitions have been added to section 710, specifically new terms such as "No Cause
Determination"; "Reasonable Cause Determination"; "Charging Party"; "Respondent"; "Delaware
Right to Sue Notice"; "Mediation"; and "Conciliation". Sections 712, 714 and 715 have been repealed
in their entirety and rewritten to accomplish the goals of initially pursuing informal methods of
resolution through mediation and conciliation and then permitting civil actions in Superior Court.
◻

**CoSponsors:**          { NONE...}

**Current Status:**     Signed  On  07/12/2004

**Volume Chapter**     74:356                          **Fiscal Note:** Not Required

**Date Governor acted:**  07/12/2004

**Full text of Legislation:**  **Legis.html**
**(in HTML format)**

**Full text of Legislation:**  **Legis.Doc**   (You need Microsoft Word to see this document.)
**(in MS Word format)**


**Committee Reports:**     Senate Committee report 05/12/04 03:59 pm F=0 M=3 U=0----->❏
                          House Committee Report 06/22/04 F=0 M=5 U=0---->❏

**Voting Reports:**        Senate vote: () Passed 6/10/2004 4:58:12 PM------->❏
                          House vote: () Passed 6/24/2004 7:24:29 PM------->❏

**Actions History:**
              Jun 24, 2004 - Passed by House of Representatives
              Jun 22, 2004 - Reported Out of Committee (LABOR) with 5 On Its Merits
              Jun 16, 2004 - Introduced and Assigned to Labor Committee in House
              Jun 10, 2004 - Passed by Senate
              May 12, 2004 - Reported Out of Committee (SMALL BUSINESS) with 3 On Its
              Merits
              Jun 12, 2003 - Assigned to Small Business committee in Senate

## CLYDE MEASE UNEMPLOYMENT APPEALS REFEREE'S HEARING

### MARCH 14, 2005

**MS. FITZGERALD:** This is the unemployment insurance appeals hearing in the matter of Clyde Mease v. Wilmington Trust. This hearing is being held on March 14, 2005 at 10:00 a.m. at the Department of Labor, 4425 North Market Street in Wilmington, Delaware. The docket number is 022929. This hearing is being held by Stephanie Fitzgerald, Appeals Referee. There are appearances today by Clyde Mease, the claimant; his attorney, Gary Aber; Dawn Howard-Bailey representing the employer represented by Allen Snook. The findings of fact of the Department of Labor are as follows: The claimant was employed by Wilmington Trust Company and last worked February 2, 2004 when he was discharged. He does not give any reason for this discharge. The employer states that claimant was discharged for not following approved required procedures, violation of company procedures. The claimant called on December 16, 2004 and was told to submit a civic statement in writing regarding his separation. He has not done so to date. Violation of company policy is considered just cause for discharge. In the absence of claimant's rebuttal it determined he was discharged from his employment with just cause in connection with his work and he is disqualified from the receipt of benefits. The issue for today's hearing is whether or not the claimant was discharged from work for just cause in connection with that work and is thus disqualified from the receipt of unemployment benefits. The law requires that the testimony that you all provide today be under oath or affirmation. Could the witnesses please place their right hand on the Bible, raise your left hand, "Do you all swear that the testimony you are about to give to this tribunal should be the truth, the whole truth and nothing but the truth under penalty of perjury?" Mr. Mease do you so swear?

**MR. MEASE:** I do.

**MS. FITZGERALD:** And Ms. Bailey, do you so swear?

**MS. BAILEY:** I do.

**MS. FITZGERALD:** Okay. As I said, today's case is a discharge case the burden is upon the employer to show just cause for discharge. So what we'll do is we'll have the employer give their testimony first. Once the employer has concluded testifying then the claimant will then be given the opportunity to ask any questions they might have of the employer. Once the employer's side is done presenting their case, we'll flip it over, the employer can then provide testimony, the claimant can then provide testimony subject to questioning by the employer upon conclusion. Once we conclude taking testimony today we'll close the hearing. I will then have 30 days to render a decision in this case. If either party is unhappy with the decision a right to further appeal process will be explained on the front of the referee's decision. And I'm going to remind everyone that today's hearing is being taped, so please make sure you speak up and provide clear answers that can be picked up by the recording device. Mr. Mease do you have any questions about the procedure?

**MR. MEASE:** Not about the procedures but a clarification.

**MS. FITZGERALD:** Okay.

**MR. MEASE:** I believe you mentioned that my last day of employment was February. It was actually December 6th. . .

**MS. FITZGERALD:** I was just reading the Deputy Decision, but we'll clarify that on the record. That's fine. Ms. Bailey do you have any questions about the procedure?

**MS. BAILEY:** Not at all.

**MS. FITZGERALD:** Mr. Snook are you an attorney representing her or are you also a witness.

**MS. BAILEY:** He's a witness.

**MS. FITZGERALD:** Okay, all right.

**MS. BAILEY:** [INAUDIBLE]

**MS. FITZGERALD:** And so you also swear that the testimony that you are about to give to this tribunal should be the truth, the whole truth and nothing but the truth, I missed that I thought that you were representing the employer. Okay, we will go ahead and get started. Whose going to be the lead witness for the employer, who wants to do the questioning and that kind of thing?

**MS. BAILEY:** I will.

**MS. FITZGERALD:** Okay. So we'll go ahead and, your name for the record is?

**MS. BAILEY:** Dawn Howard-Bailey.

**MS. FITZGERALD:** And what's you position with Wilmington Trust?

**MS. BAILEY:** Human Resources.

**MS. FITZGERALD:** And Mr. Mease was employed by Wilmington Trust?

**MS. BAILEY:** Yes.

**MS. FITZGERALD:** Do you have his employment date?

**MS. BAILEY:** Yes I do.

**MS. FITZGERALD:** And what are they?

**MS. BAILEY:** 1/27/83 and the last date 12/2/04.

**MS. FITZGERALD:** 12/2/04?

**MS. BAILEY:** Yes.

**MS. FITZGERALD:** And what was his title?

044203.1023

**MS. BAILEY:** Private Client Advisor.

**MS. FITZGERALD:** And do you have his rate of compensation handy?

**MS. BAILEY:** Yes. $112,493.

**MS. FITZGERALD:** And what led to the separation?

**MS. BAILEY:** Basically, Mr. Mease was terminated because he had been making inappropriate transactions in a client's account without the client's knowledge or permission. And he had not been following the approved procedures for these transactions. And that's why I have Mr. Snook here. He was very instrumental in this termination process. He can also explain what exactly took place and the reason for the termination.

**MS. FITZGERALD:** So really the bulk of the testimony is going to come …

**MS. BAILEY:** Exactly.

**MS. FITZGERALD:** Do you all have any questions for Ms. Bailey before we allow her to …

**MR. ABER:** I don't think she had anything of a factual significance.

**MS. FITZGERALD:** Do you want to go ahead and start asking some questions?

**MR. SNOOK:** My name is Allen Snook.

**MS. FITZGERALD:** And what's your title?

**MR. SNOOK:** Senior Vice President and head of Investment Advisory Services for Wilmington Trust Company.

**MS. FITZGERALD:** Okay, why don't you go ahead and explain what lead to the separation.

**MR. SNOOK:** Clyde was terminated because of making an inappropriate transaction in clients' accounts and I'll give you an example of what occurred. And, which was the, there was an investment made in one client's account. After the client complained about the investment, Clyde then took funds out of a second client's account to reimburse the first client's account. Of course this is highly unethical behavior and there was no, this was not disclosed. An assistant that worked in Clyde's group brought the matter to the attention of the managing director, who brought the matter to my attention and not only that because in the statement it showed the transaction going from one client's account to the other, the names on the accounts were revealed and the transfer. Clyde then instructed the assistant to take, to change the statement and we have documented this through our Legal Department at Wilmington Trust. Additionally, because of the nature of the investment, a private equity position, there may have been a loss in value as between the client transaction. We're still trying to determine if we're going to have to make good that change in value from client A to client B. Under any circumstances this is unethical behavior and is under the procedures of the bank a basis for termination. The matter was taken to the chairman of the board after review by our Legal Department [INAUDIBLE].

**VOICE:** [INAUDIBLE]

**MS. FITZGERALD:** Anything else? Do you have any questions to ask?

**MR. ABER:** Mr. Snook can you give me the name of the account for which this inappropriate investment was made initially?

**MR. SNOOK:** I can, I am not going to give you those names because of the confidentiality rules relating to it. Clyde can give you the names of the clients or you can pursue that matter with the Legal Department of the bank.

**MR. ABER:** Can you give me the name of the account from which he took money from to reimburse the original account?

**MR. SNOOK:** No, because of confidentiality of client's accounts.

**MR. ABER:** Can you give me the account number for either account?

**MR. SNOOK:** No, because of the confidentiality of the matter.

**MR. ABER:** So you can give us no evidence today of anything that you've described to us?

**VOICES: [INAUDIBLE]**

**MR. SNOOK:** What I can say is the bank does not terminate people just for fun. What they do is, this is a very serious breach of ethics and, you know, if you wish to pursue the matter with the Legal Department of the bank someone would be willing to do that. And Clyde's already given you those names.

**MR. ABER:** So sitting here today the only evidence, well actually we have no evidence of anything here except your statement of describing something in a generic form without any particulars and facts to which, to know whether it's accurate or inaccurate. I have no way of testing the accuracy of what you've told us, is there? Without giving the names or identifying these accounts?

**MR. SNOOK:** Once again, as you know, as a bank official I cannot reveal the names of client transactions.

**MR. ABER:** Let me ask you this question. Have you discussed these transactions with the owners of these accounts?

**MR. SNOOK:** Yes.

**MR. ABER:** And are these persons as upset with Mr. Mease as you are?

**MR. SNOOK:** The transaction is a violation of bank policy, you cannot move assets from one client's account to another and then transfer money back from the second client's account to the first client in violation of bank policy. That's simply not done.

**MR. ABER:** But we have no way of knowing whether that was done without you telling us what accounts that were involved.

**MR. SNOOK:** We know that it was done, that's why Clyde was terminated. Clyde was an employee in very good standing. We were all shocked by these transactions when they came to light.

**MR. ABER:** So Mr. Mease sits here and says he doesn't know what the devil you're talking about. He has no idea what accounts you are talking about, then one of you is being inaccurate.

**MR. SNOOK:** Mr. Aber, our Legal Department would be glad to sit with you and go through the transaction in detail. I don't know if you have arranged to do that, but we'd be more than happy to make all of the documentation available.

**MR. ABER:** I will represent to you that I have had consultation with Michael DeGregorio, a Senior Vice President and General Counsel, and he has declined to give me that information. And we're sitting here … Ms. Madam Referee, totally bewildered at these charges cause we have no knowledge of any operative facts.

**MS. FITZGERALD:** Do you have anything further to provide?

**MR. SNOOK:** No, because I'm not going to violate the confidentiality rules of the bank's clients

**MS. FITZGERALD:** I presume you're done asking questions?

**MR. ABER:** I have asked what I can ask.

**MS. FITZGERALD:** Do you to go ahead and ask any questions of you client then?

**MR. ABER:** Mr. Mease when you were terminated were you given any reason for being terminated?

**MR. MEASE:** None other than generic statement from Mr. Snook that I had violated policies and procedures without an explanation as to the specifics, accounts or individuals.

**MR. ABER:** And did any client approach, any of your former clients approached you with any dissatisfaction with your services.

**MR. MEASE:** None whatsoever.

**MR. ABER:** Have any clients accused you of dishonestly manipulating their funds in any way?

**MR. MEASE:** No sir, they have not.

**MR. ABER:** Have any of your former clients in any way contacted you and suggested that you somehow depleted their assets?

**MR. MEASE:** No sir, they have not.

**MR. ABER:**  We have no other testimony to present.

**MR. MEASE:**  I might add, nor have their advisors or their attorneys contacted me on any of those previous questions.

**MS. FITZGERALD:**  Do you have any questions for Mr. Mease?

**MR. SNOOK:**  I only wish to clarify one thing, that the transaction which I have described where Clyde moved money from one client's account to another to cover-up a transfer was discussed with him at the termination hearing.  It can be verified by Gail Howard who was the head of personnel at the hearing.

**MS. FITZGERALD:**  Do you have any questions for Mr. Mease though?  Do you have any questions to ask the Claimant?

**MR. SNOOK:**  Clyde, why did you do that?

**MR. MEASE:**  May I comment on the last comment by Mr. Snook?

**MR. ABER:**  Yes.

**MR. MEASE:**  Gail Howard, head of Human Relations, was present in my interview.  I asked Mr. Snook on multiple occasions during that interview to give any specifics in regard to the accusations that he had made.  He continued to respond by repeating the same statement over and over and over again.  "You have violated company policies and procedures."  After approximately the third or fourth time he made that statement Gail Howard spoke to Mr. Snook and said since he had nothing additional to add to the proceedings that he should leave the meeting room at that time.  Which Mr. Snook did.  Under no circumstances during that termination meeting did I receive any specifics either from Mr. Snook or Mrs. Howard or Ms. Howard.

**MS. FITZGERALD:**  Anything further from anyone?

**MR. ABER:**  No.

**MS. FITZGERALD:**  Okay.  I do thank you all for participating.  We'll go ahead and conclude the hearing.  As I've said I have 30 days to render a decision.  You'll get a copy of the decision in the mail.  Thank you.

6