IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CLYDE E. MEASE, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 06-271-SLR |
| | ) | |
| WILMINGTON TRUST COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

Gary W. Aber, Esquire of Aber, Baker & Over, Wilmington, Delaware.  Counsel for Plaintiff.

Sheldon N. Sandler, Esquire, and Lauren Hudecki, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, DE.  Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: July 29 , 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Clyde E. Mease, Jr. ("Mease" or "plaintiff") filed the present action against Wilmington Trust Company ("WTC" or "defendant") on April 26, 2006, alleging that his employment termination was based on age discrimination. (D.I. 1) Plaintiff originally brought claims under both state law and the Age Discrimination in Employment Act (ADEA), 42 U.S.C. § 621 et. seq.[1] (Id.) This court declined to exercise supplemental jurisdiction and granted defendant's motion to dismiss all state claims.[2] (D.I. 16) Plaintiff's amended complaint seeks declaratory judgment that defendant violated plaintiff's rights, injunctive relief to restore plaintiff's employment, and various damages, including lost wages. (D.I. 7) The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332, and 1343.

The parties have concluded discovery, and presently before the court is defendant's motion for summary judgment (D.I. 87), filed on December 15, 2009. For the reasons that follow, the court grants defendant's motion for summary judgment.

## II. BACKGROUND

Plaintiff Clyde E. Mease, Jr. ("Mease") began working for defendant Wilmington Trust Company ("WTC") on December 27, 1983. (D.I. 89 at A1-2) For most of his career, he worked as a portfolio manager, recommending and deciding which

---

[1] Plaintiff filed an amended complaint on June 27, 2006 to add diversity of citizenship as another basis for jurisdiction in this court. (D.I. 7)

[2] Plaintiff subsequently filed his state law claims in Delaware Superior Court, and the parties agreed that discovery in both courts could be used in either court. (D.I. 96 at 1)

investments to buy and sell for wealthy clients. (D.I. 90 at A343-44) In 2000, Allen

Snook ("Snook"), the division manager, reorganized the trust division of WTC into

Wealth Advisory Services ("WAS") and reassigned employees into three teams. (*Id.* at

A346-48) Mease, 51 years old at the time, was promoted to the position of senior

private client advisor ("PCA") to head one of these teams.[3] (D.I. 90 at A342a, 346)

It was Mease's job as a senior PCA to meet and communicate regularly with his

clients, as well as to generate new business. (*Id.* at A349-53) Norman C. Griffiths

("Griffiths") and Nicole Rossman ("Rossman") worked as his assistants and handled

administrative paperwork and phone calls. (D.I. 89 at A195, 200; D.I. 90 at A344-45,

355-56) He also had three investment advisors ("IA") on his team, G. Keith Robertshaw

("Robertshaw"), Clyde Kessinger ("Kessinger") and Chris Sullivan ("Sullivan").[4] (D.I. 90

at A345; A451) The IAs were responsible for reviewing clients' investments,

recommending changes, and executing transactions. (*Id.* at A350; A407; A463, ¶ 2) As

a result, it was usually the responsibility of the IAs, not Mease, to review clients'

investments or buy and sell on behalf of clients. (*Id.* at A350-51) However, Mease did

note that he would sometimes buy and sell without the help of the IAs when a client

approached him directly. (*Id.* at A358)

---

[3] The other two teams were led by Benjamin Ledyard ("Ledyard") and Martin
Eichelberger ("Eichelberger"). (D.I. 90 at A451)

[4] The IAs on Mease's team reported to both Mease and Christopher Madel
("Madel"), Managing Director of Investments for Delaware. (D.I. 90 at A350) Mease, in
turn, reported to his immediate supervisor Ledyard who, in addition to being a PCA in
charge of a team, was the managing director of WAS. (*Id.* at A345-46; A451) Ledyard
reported to Snook, the division manager. (*Id.* at A419)

Between 1994 and 1999, prior to becoming a senior PCA, Mease received mixed

reviews in his annual performance evaluations. (*See* D.I. 89 at A3-47)  While his

manager and co-workers praised his business results and technical knowledge (*id.* at

A4; A9; A17), he consistently received criticism about his organizational skills (*id.* at A9;

A18; A37) and poor interpersonal and communication skills (*id.* at A17; A28).  However,

Mease's performance reviews did reflect improvement over the years. (*Id.* at A40)  For

example, his 2002 evaluation commended him for "shar[ing] his acquired experience

with his associates" and for mentoring a co-worker. (D.I. 97 at B149-50)  His last

evaluation, in 2003, positively reviewed his effort in helping his team finish year-end

tasks. (*Id.* at B158)

Mease managed some of WTC's wealthiest and most important clients, including

the Darden/Field family. (*Id.* at A4)  Dr. Colgate Darden ("Darden") and his sister, Irene

Field ("Field"), both had numerous accounts with WTC. (D.I. 90 at A447; A459)  On

December 2, 2002, Mease purchased units of Camden Private Capital Venture, LLC

("Camden"),[5] a private equity considered to be a type of alternative investment, in the

name of two Darden/Field Trusts. (D.I. 89 at A48-56; A235; D.I. 90 at A362)  In 2004,

Darden and Field became unhappy that Mease had invested some of their money in

Camden. (D.I. 89 at A111; D.I. 90 at A325; A459)  They were concerned about

Camden's inefficient management of their money, so Field asked, in a fax to Mease on

May 6, 2004, to be divested of their investments in Camden. (D.I. 89 at A111)

Although Mease assured Field that her instructions would be followed, he did not

---

[5] Camden was created at the request of WTC so that WTC could invest its own
clients in it. (D.I. 98 at B477)  WTC had a 31.25% ownership of Camden's parent
company, Camden Partners. (D.I. 97 at B256)

promptly take action. (*Id.* at A127)  On August 2, 2004, Field faxed another letter to Mease claiming that the investment in Camden was made "against [her and Darden's] wishes" and reiterating that they wanted it removed from their trusts "immediately."[6] (D.I. 89 at A123)  Fields also complained of Camden's failure to produce K-1 statements in a timely fashion. (*Id.* at B260)  Mease admits that Field's two letters were complaints (D.I. 90 at A366-67; A372-73) which, according to company policy, should have been handled with the consultation and advice of a manager, as well as forwarded to the WAS Risk and Audit Manager, Sharita Perkins. (*Id.* at A455-57; A458)  WTC's client complaint procedure also called for complaints to be resolved within 20 days. (*Id.*)

In response to Field's complaint letters, Mease unilaterally moved the Camden units to the trust account of another client, Crawford H. Greenewalt, Jr. ("Greenewalt"), without Greenewalt's consent. (*Id.* at A332-33)  However, Greenewalt's Trust did not permit WTC, as trustee, to make any investments without the consent of its advisor, Greenewalt.[7] (D.I. 89 at A90)  As a result, both Snook and Madel testified that the transfer of Camden units to the Greenewalt Trust should not have occurred. (D.I. 90 at A323; A425-26)  Although there are no written company documents or government

---

[6] As explained by Camden's own CFO in his deposition, the value of the Camden units were expected to follow a J-shaped trajectory, initially decreasing in value due to high start-up costs but eventually increasing in value. (D.I. 89 at A244-45)  Thus, it was "unusual" for someone to sell a Camden investment only two years after buying it because it would still be in the decreasing portion of the J-curve. (*Id.* at A249)

[7] The language of the Greenewalt Trust, as well as testimony by Sullivan (the IA on the Greenewalt account) and Madel, indicate that investments on behalf of the Greenewalt Trust required the consent of Greenwalt. (D.I. 89 at A90; D.I. 90 at A463-64; D.I. 100 at C77)  Ledyard and WTC's Assistant General Counsel both testified that they were unsure whether WTC may have had the discretion to make Greenewalt's investment decisions for him. (D.I. 98 at B363; B509-10)  This factual uncertainty is immaterial to the court's decision.

regulations explicitly outlining the standards for such a transfer between unrelated accounts, Madel testified that general knowledge and Chartered Financial Analysts' standards[8] should have prevented this unauthorized transfer from happening.  (*Id.* at A324)  No such transfer of illiquid private equity investment units between unrelated clients had ever been executed before at WTC.  (*Id.* at A436)

When Robertshaw, the IA assigned to the Darden/Field account, found out about Mease's plan to unilaterally transfer the Camden units to Greenewalt's account, he told Mease that what he was doing seemed wrong, but Mease ignored his advice.  (*Id.* at A414-16)  Instead, Mease only consulted with Camden's CFO for advice on how to transfer the units.[9]  (*Id.* at A370, 385-86)  Mease then instructed one of his assistants, Griffiths, to prepare the transfer papers using the language suggested by Camden.  (D.I. 97 at B132; D.I. 98 at B405)  The actual transfer of the Camden units from the Darden/Field account to the Greenewalt Trust (the "Camden transfer") was completed on August 5, 2004 and backdated to be effective on July 1, 2004.  (D.I. 89 at A120; D.I. 98 at B432-35; B532)

Although Mease phoned and wrote Field to notify her that the Camden investment had been removed from her and Darden's accounts, he apparently made no effort to inform Greenewalt about the Camden transfer.  (D.I. 90 at A378)  Greenewalt was out of the country at the time of the transfer but, even after he returned to the

---

[8] Mease was not a Chartered Financial Analyst.  (D.I. 98 at B530)

[9] Mease claims he obtained Ledyard's approval prior to making the transaction, which Ledyard denies.  (D.I. 90 at A314; A371-72)  Even if the discussion did take place with Ledyard, Mease admits he did not tell Ledyard all the details of the transaction. (D.I. 90 at A377)  He only informed Ledyard that another investor was involved.  (*Id.*)

United States in the fall of 2004, Mease failed to notify him. (*Id.* at A452)  It was not

until early 2005, when Ledyard and Sullivan traveled to California to meet with

Greenewalt, that Greenewalt learned about the Camden transfer. (*Id.* at A437; A452)

At the meeting, Ledyard promised Greenewalt that WTC would reimburse him if the

money taken from his account was more than the value of the Camden units. (*Id.* at

A452, ¶ 10)

When Murphy and Kessinger, two of the IAs on Mease's team, found out about

the Camden transfer, they expressed their concerns to Ledyard, Snook and Madel. (*Id.*

at A301; A422-23; A453-54, ¶¶ 2-4)  Snook investigated Mease's actions and, after

conferring with senior management and WTC's General Counsel, concluded that Mease

had made unauthorized transactions between unrelated accounts, had attempted to

falsify records,[10] and had transferred assets for less than fair market value.[11] (D.I. 89 at

A190; D.I. 90 at A423-25; A427-28)  Subsequently, Snook and Gail Howard ("Howard"),

WTC's head of human resources, met with Mease on December 2, 2004 and

terminated his employment. (D.I. 89 at A138; A227-232)

---

[10] Mease had his assistant Griffiths prepare the transfer documents to show an
intervening transfer to and from WTC, rather than a direct transfer that would appear on
each client's statement. (D.I. 90 at A425-26; A334-36; A447, ¶ 10)  Mease's asserted
reason for doing this was to protect the clients' identities. (D.I. 89 at A124; A212-13)
Defendant contends this was a paperwork stunt orchestrated by Mease to conceal the
nature of the transfer. (D.I. 88 at 16)  For purposes of this motion, the court does not
need to resolve the factual dispute as to whether Mease falsified any records.

[11] WTC contends that Mease transferred the Camden units to Greenewalt's Trust
at full value, even though they were valued at less than full value at the time of the
transfer. (D.I. 97 at B36)  As discussed, *infra*, Mease disputes the contention that he
did this knowingly.

According to company policy, an employee must be informed of why he or she is being terminated. (*Id.* at B441-42) At the termination meeting, Snook informed Mease that he was being terminated for "violat[ing] policies and procedures" but offered no detailed explanation. (D.I. 98 at B333) Snook, following an outline prepared by Howard, told Mease he was being terminated for the following problems: (1) making "inappropriate transactions" without the client's knowledge or permission; (2) not following approved, required procedures for transactions; and (3) causing Snook to lose trust in Mease and his actions.[12] (D.I. 89 at A138) According to Howard, "[Snook] repeated the fact that there had been a problem with inappropriate transactions in clients' accounts. That part of the conversation repeated itself a couple of times without much . . . additional information being provided and no new question being asked." (D.I. 90 at B448) When asked if he had "any explanation for what [he had] done," Mease answered, "I am not an investment advisor. I don't do transactions. I work with three IAs who do transactions." (D.I. 89 at A138)

On December 3, 2004, WTC's Legal Department conducted a follow-up investigation to determine whether Mease's actions had caused any clients to lose money. (*Id.* at A152-60) It concluded that Mease had improperly transferred the Camden units to the Greenewalt account and that he had failed to value the shares properly, resulting in Greenewalt's trust paying $75,000 for an investment worth only $31,312.50 at the time of the transfer. (*Id.* at A171-72; A175) In addition, WTC's Legal

---

[12] As described by Howard in her deposition, each time Snook made a point during the termination meeting that appeared on the outline they had prepared, she would check it off. (D.I. 98 at B448; D.I. 89 at A138) Howard also took notes on the outline of what Mease said during the termination meeting. (D.I. 89 at A138)

Department found that Mease had failed to consult with the appropriate IAs and had failed to obtain the requisite subscription agreements and suitability forms prior to making the transfer. (*Id.* at A139-47; A165-72; A185-88)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson*

8

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Revis v. Slocomb Indus.*, 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987)).

## IV. DISCUSSION

Plaintiff's complaint alleges employment discrimination on the basis of age under the ADEA, which provides, in relevant part, "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 263(a). Protection under the ADEA extends only to individuals who are at least 40 years old. *See* 29 U.S.C. § 261(a).

### A. Evidentiary Framework

In analyzing ADEA claims without direct evidence of discrimination, the Third Circuit has adopted the elements of the prima facie case enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).[13] *See, e.g., Smith v.*

---

[13] *McDonnell Douglas* was a Title VII case, but the evidentiary burdens are applicable to ADEA cases. *See Martin v. Health Care & Ret. Corp.*, 67 F. App'x 109, 111-12 (3d Cir. 2003). Although the Supreme Court "has not definitely decided whether

*City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009); *Martin v. Health Care & Ret. Corp.*,

67 F. App'x 109, 111-12 (3d Cir. 2003); *see also Reeves v. Sanderson Plumbing Prod.,*

*Inc.*, 530 U.S. at 141-42 (recognizing that the Courts of Appeals have adopted the

*McDonnell Douglas* framework in analyzing ADEA cases).  The *McDonnell Douglas*

evidentiary framework consists of three steps, and the burden of proof ultimately rests

on the plaintiff.  *Gross*, 129 S. Ct. at 2352; *see also Texas Dept. of Comm. Affairs v.*

*Burdine*, 450 U.S. 248, 253 (1981).  First, the plaintiff must establish a prima facie case,

which creates a presumption of discrimination, by showing that he was:  (1) within the

ADEA's protected class, i.e. at least 40 years old; (2) discharged; (3) qualified for the

job; and (4) replaced by someone sufficiently younger to create an inference of age

discrimination.  *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997).

The parties do not contest, for purposes of the motion for summary judgment, that

plaintiff at bar has established a prima facie case of discrimination.  (D.I. 88 at 27)

In step two, once the plaintiff has established his prima facie case, the burden of

proof shifts to the employer to articulate a legitimate, nondiscriminatory reason for the

discharge.  *See Keller*, 130 F.3d at 1108; *Stewart v. Rutgers*, 120 F.3d 426, 432 (3d Cir.

1997).  The Supreme Court has held that this step does not require the employer to

disprove a discriminatory motive but merely to state a "legitimate, nondiscriminatory"

motive for its employment action.  *Bd. of Trustees v. Sweeney*, 439 U.S. 24, 26 (1978).

---

the evidentiary framework of *McDonnell Douglas* . . . utilized in Title VII cases is
appropriate in the ADEA context," *Gross v. FBL Financial Services, Inc.*, 129 S. Ct.
2343, 2349 n.2. (2009), it has applied the *McDonnell Douglas* framework where parties
did not contest its applicability to the ADEA context.  *See Reeves v. Sanderson*
*Plumbing Prod., Inc.*, 530 U.S., 133, 141-42 (2000).  The Third Circuit has understood
the *McDonnell Douglas* burden-shifting framework to apply to ADEA cases.

As long as the employer's proffered reason creates a genuine issue of fact, then the presumption of discrimination drops and, in step three, the burden of proof shifts back to the plaintiff to show that the "employer's proffered reason [for the employment action] was not the true reason for the . . . decision" but was instead mere pretext for discrimination. *Stewart*, 120 F.3d at 432 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 508 (1993)) (alterations in original); *see also McDonnell Douglas*, 411 U.S. at 802. To make the requisite showing of pretext, the plaintiff must produce evidence

> from which a factfinder could reasonably either (1) disbelieve [defendant's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [defendant's] actions.

*Martin*, 67 F. App'x at 112 (alterations in original) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)); *see also Keller*, 130 F.3d at 1108. Alternatively, a plaintiff may submit evidence of the employer's past treatment of him, or evidence of the employer's general policy and practice toward the protected class of employees. *Martin*, 67 F. App'x at 112 (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 523-24 (3d Cir. 1992)).

To counter Mease's establishment of the prima facie case of discrimination, WTC has proffered legitimate, nondiscriminatory reasons for terminating his employment, all related to the Camden transfer: (1) he violated bank practices; (2) he failed to consult with his investment team; and (3) he could no longer be trusted. (D.I. 88 at 27-31) As a result, under the *McDonnell Douglas* burden-shifting framework, Mease bears the burden of demonstrating pretext. Mease has not alleged any past treatment of him or other employees to evidence age discrimination. Instead, his pretext argument is

11

focused on: (1) undermining WTC's proffered reasons so that a reasonable factfinder may disbelieve WTC's explanation for terminating him; and (2) submitting that a reasonable factfinder could find that age was a determinative cause of the termination. (D.I. 96 at 27-36)

### B. Showing Pretext

#### 1. Undermining WTC's proffered reasons

In order to demonstrate pretext, Mease offers evidence that he asserts would cause a reasonable factfinder to disbelieve WTC's proffered reasons for terminating him. He alleges that WTC: (1) delayed reimbursing Greenewalt; (2) misrepresented how long, after his termination, his clients were reassigned to Ledyard; (3) backdated and misrepresented the value of the transferred Camden units; (4) failed to show that he violated any specific policy or procedure; and (5) failed to follow its own procedure in terminating him.[14] (D.I. 96 at 27-33)

To make a showing of pretext, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Stewart*, 120 F.3d at 433. Instead, the plaintiff must demonstrate "such weakness, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a

---

[14] Mease also claims that WTC took inconsistent positions regarding the company's confidentiality policy. (D.I. 96 at 31) But the record shows no inconsistency in WTC's position, only that one of its witnesses thought Mease had violated company policy by allowing client names to appear on the Camden transfer statements when in fact he had removed the names. WTC never used this factual error in any of its legal arguments.

reasonable factfinder could rationally find them unworthy of credence, and hence infer

that the employer did not act for [the asserted] nondiscriminatory reasons." *Id.*

(alteration in original) (quotations omitted) (citing *Fuentes*, 32 F.3d at 765). As a first

matter, several of Mease's allegations do not go toward showing weakness,

implausibilities, inconsistencies, incoherences, or contradictions in the employer's

proffered reasons. That there may have been delays in reimbursing Greenewalt or that

Ledyard may have received Mease's clients for longer than WTC originally claimed is

immaterial for discrediting WTC's reasons for terminating Mease.[15]

Mease goes to great length to try to show that WTC deceptively altered

documents to backdate the value of the transferred Camden units. (D.I. 96 at 29-30)

WTC relies on an online portfolio document (D.I. 97 at B36) showing that "as of August

31, 2009," the Camden units were valued at 41.75% of their market value to assert that

Mease improperly transferred the Camden units at full market value.[16] (D.I. 88 at 17-19)

WTC's online portfolios are internal documents that are changed as a matter of course

to reflect updated values after they are received from investment companies. (D.I. 97 at

B289-90) The document in question was backdated when WTC received the updated

---

[15] However, the redistribution of Mease's duties to Ledyard, who is 17 years younger, is relevant in Mease's other pretext argument, *infra*, pointing to age as a determinative factor.

[16] Mease also notes that several documents from other client accounts show that the Camden units remained listed at 100% market value past October 5, 2009. (D.I. 97 at 92-118) He argues that this indicates WTC fabricated the Darden/Field account document (*Id.* at B36) in order to support a post hoc fabrication. (D.I. 96 at 18-22) However, as Mease himself notes, the Darden/Field document and the other client documents are not the same type of documents. (*Id.* at 21) While the other client documents are client statements, the Darden/Field document is an internal, online portfolio document that is regularly updated at a later date "as of" a prior date. (*Id.*)

13

value of the Camden units sometime after October 5, 2009, in order to reflect the prior

market value at the relevant time. (*Id.* at B289, 292)  Thus, Mease asserts, he could not

have seen or known of the lowered valued of the Camden units at the time of the

transfer on August 4, 2004. (D.I. 96 at 22)  Mease's argument attempts to rebut WTC's

contention that the improper valuation of the transfer played a role in his termination.

However, even if the improper valuation were not a legitimate reason for Mease's

termination, such evidence alone would not be sufficient for a complete showing of

pretext because, "to avoid summary judgment, the plaintiff's evidence rebutting the

employer's proffered legitimate reasons must allow a factfinder reasonably to infer that

**each** of the employer's proffered nondiscriminatory reasons . . . was either a post hoc

fabrication or [pretext]." *Fuentes*, 32 F.3d at 764 (citations omitted).  WTC noted

several other circumstances of the Camden transfer that it believed to be illegitimate or

contrary to company practice, such as Mease's failure to obtain Greenewalt's consent

or notify him of the transfer, and his failure to follow company precedent.  Moreover,

WTC cited an overall loss of trust in Mease, arising out of the Camden transfer.

Evidence rebutting Mease's termination because of an improper valuation of the

Camden units does not cast substantial doubt on such proffered legitimate,

nondiscriminatory reasons.  Aside from any financial valuation aspect, the Camden

transfer was still allegedly an improper transaction.  Therefore, the court must determine

whether Mease's other arguments sufficiently cast enough doubt for a reasonable

factfinder to disbelieve the rest of WTC's proffered nondiscriminatory reasons for

terminating him.

14

The Third Circuit Court of Appeals, in *Martin v. Heath Care & Retirement Corp.*, walked through a legal analysis for pretext that is illustrative for the present case. In that case, the plaintiff, Martin, was a former director of nursing at a retirement home who brought Title VII and ADEA claims against her employer after being fired. *Martin*, 67 F. App'x at 111. The retirement home's proffered reason for terminating her employment was that she had failed to respond to resident family concerns in two separate instances. *Id.* at 111-12. Martin pointed to several pieces of evidence to support a finding of pretext, all of which the court rejected in affirming the district court's summary judgment finding for the defendant employer. *Id.* at 112-14. Plaintiff at bar makes several similar arguments.

First, Martin argued that her employer's human resources manager had stated that one of the instances of misconduct may have been a misunderstanding. *Id.* at 112. However, the court rejected this argument because the question was not whether the employer made a sound employment decision but whether the real reason for the decision was discrimination. *Id.* at 112 (citing *Keller*, 130 F.3d at 1109). Thus, in the present case, even if WTC had no explicit policy against unilaterally transferring funds between unrelated accounts (that is, even if Snook was wrong or mistaken in believing Mease's misconduct violated company policy), this does not make Snook's grounds for terminating Mease pretextual. Furthermore, Mease's assertion that Ledyard approved the Camden transfer is also without merit. There is no evidence that Ledyard ever approved of the way the Camden transfer was executed. While Mease may have talked to Ledyard about it in a "short, very brief" meeting (which Ledyard denies), Mease

15

himself admits that he never told Ledyard the details of the transaction beyond the fact that he was about to do an account transfer. (D.I. 90 at A372, 377)

Second, the plaintiff in *Martin* argued that pretext could be shown because her supervisor never personally spoke with her regarding the two incidents of misconduct and never gave her an opportunity to defend herself. *Martin*, 67 F. App'x at 112-13. Plaintiff at bar makes the same argument, alleging that Snook never gave him a detailed explanation of his misconduct and never gave him the opportunity to defend himself. (D.I. 96 at 33) Even if Mease did not get an opportunity to defend himself, the question here, according to the court in *Martin*, is "whether [the employer] actually believed the descriptions of the incident to be accurate and relied upon them."[17] *Id.* (citing *Fuentes*, 32 F.3d at 766-67). Mease did not introduce any evidence to suggest that Snook did not believe the Camden transfer qualified as misconduct. In fact, Snook conducted an investigation of Mease's actions prior to terminating him and concluded that Mease had made unauthorized transactions between unrelated accounts, among other violations. (D.I. 89 at A190; D.I. 90 at A423-25; A427-28) Therefore, Mease's argument that he did not get an opportunity to defend himself cannot support a finding of pretext.

Third, the plaintiff in *Martin* pointed out that she had "above average" performance reviews prior to her termination, *Martin*, 67 F. App'x at 113, just as Mease points out he showed positive improvement in his performance reviews over the years. However, the court in *Martin* refused to consider the performance reviews because they

---

[17] In addition, WTC Corrective Action policy, which allows immediate termination for "willful violation of company policy and other misconduct," does not guarantee an opportunity for the terminated employee to defend himself. (D.I. 100 at C15-16)

were irrelevant to the two instances of misconduct for which the employer said Martin was terminated. *Id.*; *see also Fuentes*, 32 F.3d at 766 (rejecting plaintiff's timing argument that "things were going well for him" up until the adverse employment action because it was "not the type of timing evidence" that would "give rise to an inference of improper motivation"). Likewise, WTC's proffered reason for terminating Mease was the specific instance of the improper Camden transfer, not any long-term performance issues. As such, any discussion about Mease's performance reviews does not cast any real doubt on WTC's proffered legitimate reason.

Fourth, Martin argued that her supervisor's failure to progressively discipline her before terminating her employment showed the employment action was pretextual. *Martin*, 67 F. App'x at 113. The court reasoned that "an employer's decision that an incident is serious enough to warrant termination rather than a less severe punishment does not show that the reason for termination is pretextual." *Id.*; *see also EEOC v. Rite Aid Corp.*, Civ. No. 03-777-GMS, 2005 WL 3434779, at *5 (D. Del. Dec. 12, 2005) ("[T]he fact that [the employer] may not have followed its progressive discipline policy in dealing with [plaintiff's] performance issues does not warrant a finding of pretext."). Immediate termination is also consistent with WTC's policy. The company's Corrective Action policy provides a progressive discipline policy but also specifies that **immediate** termination may result for "willful violation of company policy and other misconduct." (D.I. 100 at C15-16) The policy lists, as examples of grounds for immediate termination, "unauthorized variations from company procedures resulting in material loss, damage or

jeopardy to the company" and "unethical conduct that reflects unfavorably on the company." (*Id.*)

Taken together, the evidence raised by Mease would not lead a reasonable factfinder to find WTC's proffered reasons for its action "unworthy of credence." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (quoting *Fuentes*, 32 F.3d at 765). WTC had several reasons for terminating Mease, including his improper handling of the Camden transfer and a loss of trust in him, which Mease has not sufficiently rebutted as pretext.

### 2. Pointing to age as a determinative factor

Alternatively, a plaintiff may point to age as a determinative factor in order to show pretext. *See Martin*, 67 F. App'x at 112. The Supreme Court in *Gross* held that, in the ADEA context, the plaintiff must prove by a preponderance of the evidence that age was the "but-for" cause of the challenged employer decision and not just a motivating or contributing factor. *Gross*, 129 S. Ct. at 2352; *see also Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 141-43 (2000) ("[P]laintiff's age must have 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.'") (alterations in original) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)); *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (interpreting *Gross v. FBL Financial Services, Inc.* similarly). The Court in *Gross* explained that, unlike Title VII, the ADEA requires a showing that if not for the plaintiff's age, the adverse employment action would not have occurred. *Gross*, 129 S. Ct. at 2349. Therefore, it is not enough for plaintiff to show that age was merely

a contributing factor in his termination; age must have been a determinative or but-for cause of termination.

To argue that age was a determinative factor of his termination, Mease asserts that his duties were transferred to a younger individual, Ledyard, following his termination. (D.I. 96 at 34) When Mease was terminated, Ledyard was 37 years old, or 17 years younger than Mease, and took over responsibility for four of Mease's five largest clients. (D.I. 98 at B502-03; B540) Ledyard held responsibility for these four clients until the end of 2005, or for about one year after Mease's termination. (D.I. 97 at B33) The delegation of duties to a younger employee alone, however, is not sufficient to demonstrate pretext.[18] *See, e.g., Birkbeck v. Marvel Lighting,* 30 F.2d 507, 512 (4th Cir. 1994) ("[R]eplacement by a younger employee is not dispositive of age discrimination. If it were, it would transform the ADEA into something akin to a strict seniority protection system.").

Mease must point to evidence of pretext sufficient to rebut WTC's proffered nondiscriminatory reasons for terminating him. However, Mease fails to offer any evidence – besides delegation of Mease's duty to a younger individual for a year – to

---

[18] Mease cites *Steward v. Sears Roebuck & Co.,* 231 F. App'x 201, 208 (3d Cir. 2007), for the proposition that "evidence [to establish an inference of age discrimination] sufficient to support a jury verdict does not differ markedly from that necessary for the elements of a prima facie case." (D.I. 96 at 34) However, the court in *Steward* only addressed the question in light of whether the fourth element of the prima facie case (an inference of age discrimination) was established, before going on to separately address whether pretext was demonstrated. *Steward,* 231 F. App'x at 210; *see also Maxfield v. Sinclair Int'l,* 766 F.2d 788, 792 (3d Cir. 1985) (noting in the context of the fourth element for a prima facie case that "[a]lthough replacement by someone younger, without more, will not give rise to an inference of age discrimination, it has been noted that a substantial difference in the ages may be circumstantial evidence that gives rise to that inference").

19

point to age as a determinative factor in his termination. He offers no evidence that any WTC supervisors made any ageist remarks to him or other employees, or any other evidence to show that a determining motive behind his termination was his age.[19] Thus, Mease's attempt to show that age was a determining factor in his termination fails to establish pretext.

## V. CONCLUSION

For the foregoing reasons, plaintiff has failed to meet his burden of proof under ADEA analysis to show that defendant's reasons for terminating him were mere pretext. Mease has not produced sufficient evidence to allow a reasonable factfinder to disbelieve WTC's proffered legitimate reasons for terminating him or to demonstrate that age was a determinative factor in his termination. The court grants defendant's motion for summary judgment. An appropriate order shall ensue.

---

[19] Snook was himself 50 years old when he terminated Mease. While there is no "conclusive presumption" that an employer would not discriminate against members of his own class, *Johnson v. Trans. Agency*, 480 U.S. 616 (1987), plaintiff's case may be "weakened by the fact that the decisionmaker was a member of plaintiff's protected class." *EEOC v. BE&K Eng'g Co.*, 536 F. Supp. 2d 498, 506 n.34 (D. Del. 2008).

In addition, the person (Snook) who terminated Mease was the same person who promoted him to the position of senior PCA in 2000. (D.I. 90 at A342a, 346) The Third Circuit has noted that such evidence, while not dispositive, may be relevant to show that no discrimination occurred. *See Waldron v. SL Indus., Inc.*, 56 F.3d 491, 496 n.6 (noting that in some circumstances, it may be appropriate to apply the Fourth Circuit's logic that a strong inference for non-discrimination exists where the same actor took both positive and adverse employment actions against plaintiff).